UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov

In re:                                                          Chapter 11

ADVANCE CASE PARTS, INC.,                                       Case No. 19-14930-RBR

       Debtor.

_____/

**DECLARATION OF PAUL PODHURST IN SUPPORT OF
THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

       I hereby declare that the following is true to the best of my knowledge, information, and belief:

## I.    INTRODUCTION

       1.     My name is Paul Podhurst.  I am over the age of 18 and am competent to testify. I am the President and CEO of Advance Case Parts, Inc. (the "Debtor").

       2.     To minimize any adverse effects on the Debtor's business as a result of the commencement of this Chapter 11 case, the Debtor intends to request various types of relief in certain "first day" applications and motions (collectively, the "First Day Motions").  The First Day Motions seek relief and are designed to, among other things:  (a) continue the Debtor's operations while in Chapter 11 with as little disruption as possible; (b) allow the Debtor to continue serving its valued customers and operate its business pending a restructuring of the Debtor's debt; and (c) establish procedures for the smooth and efficient administration of this case.  The relief requested in the First Day Motions will be crucial to the success of the Debtor's efforts to facilitate an orderly reorganization to be effectuated through the contemplated restructuring of the Debtor's debts.

       3.     I submit this declaration (the "Declaration") in support of the Debtor's Chapter 11 voluntary petitions and the First Day Motions.  As the President and CEO of the Debtor, I have

48600445;2

personal knowledge of the Debtor's books and records, and the Debtor's financial and operational affairs. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees or advisors. In making the statements herein based upon my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees, I have relied upon these employees to accurately record, prepare and collect any such documentation and other information.

4.      If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or my personal opinion, except as otherwise noted. I am authorized to submit this Declaration on behalf of the Debtor.

## II.    BACKGROUND

**A.      The Chapter 11 Filing.**

5.      On April 16, 2019 (the "Petition Date"), the Debtor filed voluntary petition in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

6.      As of the date hereof, no official creditors committee has been appointed in this case. In addition, no trustee or examiner has been appointed.

7.      The Debtor is operating its business and managing its affairs as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**B.      Overview of the Debtor's Corporate Structure.**

8.      The Debtor is a subchapter s corporation organized under the laws of the State of Florida.

9.      The Debtor has two officers: *(i)* myself, Paul Podhurst, President; and *(ii)* George E. Hude, Jr., Treasurer.

10.     I own 57.28% of the outstanding shares in the Debtor and George E. Hude, Jr. owns the remaining 42.72%.

**C.      Description of Debtor Business and Reason for Filing Chapter 11.**

11.     The Debtor specializes in providing products and services for the supermarket and food industries, including replacement parts for refrigeration units, refrigeration case units, and oven units in commercial businesses. The Debtor's operations are located at 12489 NW 44th Street, Coral Springs, Florida 33065, and it employs 36 employees.  The Debtor also employs a service provider in Richmond, Virginia to service certain of its customers located in the Richmond area.

12.     The Debtor is filing this chapter 11 petition in order to preserve the going concern value of the Debtor's assets and operations, maximize the Debtor's value for the benefit of the Debtor's creditors, reject contractual agreements and unexpired leases no longer necessary to the operations of the Debtor's business, and surrender certain collateral that is burdensome to the Debtor's operations.

**D.      Historical Financial Performance.**

13.     The Debtor's 2019 year to date gross income is approximately $1,275,000; the Debtor's gross income for 2018 was $5,639,386; and for 2017 the Debtor's gross income was $5,203,982.00.

### III.    DEBTOR'S PRE-PETITION FINANCING

14.     Prior to the Petition Date the Debtor and CDS Business Services, Inc. d/b/a Newtek Business Credit (the "Lender") were parties to an Accounts Receivable Administration Agreement dated February, 2016 and an Inventory Advance Agreement secured by a UCC-1

Finance Statement recorded as Instrument No. 201606526500 in the Florida Secured Transaction Registry on February 17, 2016 (hereinafter, together with all amendments thereto and modifications thereof, the "Pre-Petition Factor Agreements").  As of the date of this Motion, the amount owing to the Lender under the Pre-Petition Factor Agreements is approximately $1,117,119.26 (the "Factor Secured Debt").

15.     Pursuant to the Pre-Petition Factor Agreements, the Debtor receives from Lender 80% of each account receivable sold to Lender on the date the A/R is transferred to Lender and receives the remaining 20% of each A/R sold to Lender at the time the A/R is collected by the Lender.  The Debtor is obligated to make the following payments to Lender pursuant to the Pre-Petition Factor Agreements: (i) monthly interest payments to Lender under the Pre-Petition Factor Agreements in the amount of 3.5% above the Prime Rate; (ii) processing fees equal to $.35 for each transfer to Lender from Debtor's account debtors; (iii) statement fees equal to $.85 per statement issued by Lender to Debtor's account debtors, plus any cost of first class postage; and (iv) a collateral monitoring fee equal to 0.45% of the outstanding advanced to Debtor in the calendar month preceding the month for which the monitoring fee is calculated (the "Factor Obligations").

16.     In the one-year period preceding the commencement of this case, the Factor Obligations have averaged approximately $17,500 per month.

17.     Prior to execution of the Pre-Petition Factor Agreements, the Debtor and Debtor's affiliate, Advance Case Parts RE Holdings, LLC ("ACP Real Estate"), were co-obligors on a Small Business Administration loan with Newtek Small Business Finance, LLC (the "SBA Lender")[1] for a principal balance of $3,033,000.00 secured by a first position lien on all assets of

---

[1] Lender and SBA Lender are affiliated entities that are independently operated.

48600445;2

the Debtor and ACP Real Estate (the "SBA Loan").  The SBA Loan was used by the Debtor and ACP Real Estate to *inter alia*: (i) allow ACP Real Estate to acquire commercial real property that the Debtor currently leases from ACP Real Estate for its operations; (ii) payoff certain existing secured indebtedness by Debtor and ACP Real Estate; and (iii) provide Debtor with additional operating capital.  The amount owing to the SBA Lender under the SBA Loan is approximately $3,036,872.71 (the "SBA Secured Debt").

18.     Prior to the commencement of this case, the Lender and SBA Lender executed two intercreditor agreements wherein the SBA Lender subordinated its first position lien in favor of Lender as to Debtor's inventory, accounts, and any proceeds derived from any inventory or accounts (the "Intercreditor Agreements").   As security for the payment of all Factor Obligations, the Debtor granted to Lender pursuant to the Pre-Petition Factor Agreements and the Intercreditor Agreements documents (collectively, the "Pre-Petition Loan Documents"), security interests in and liens (collectively, the "Pre-Petition Liens") upon all assets of the Debtor, including, without limitation, all of Debtor's accounts, inventory, deposits, and any proceeds of the aforementioned collateral (all such personal property, as the same existed on the Petition Date, together with all cash and non-cash proceeds thereof, the "Pre-Petition Collateral").

19.     As of the Petition Date, the Debtor estimates that the Pre-Petition Collateral consists of approximately: (i) $55,000 currently on deposit in the Debtor's operating and checking accounts; (ii) $560,000 of accounts receivable that are less than 90 days old; and (iii) $550,000 in existing inventory.

## IV.    FIRST-DAY MOTIONS AND NECESSITY FOR EMERGENCY HEARINGS[2]

20.    As President and CEO of the Debtor, I am generally familiar with the contents of each First Day Motions (including the exhibits thereto) described in further detail herein.  Based upon that general familiarity and the information provided to me by other members of the Debtor's management team and my colleagues who report to me or provide information to me in the ordinary course of the Debtor's business, I believe that the relief sought in each First Day Motions is necessary to:  (a) enable the Debtor to operate in Chapter 11 with minimal disruption or loss of productivity and value; (b) allow the Debtor to continue serving its valued customers and operating its business pending a restructuring of its debt; and (c) prevent immediate and irreparable harm to the Debtor's businesses as a whole.  Concurrently herewith, the Debtor has filed or will be filing the following First Day Motions for which the Debtor requests that the Court conduct a hearing as soon as possible after the commencement of the Debtor's bankruptcy case (the "First Day Hearing"):

  i.    Debtor's Emergency Application For Approval, on an Interim and Final Basis, of Employment of Eyal Berger and the Law Firm of Akerman LLP as General Bankruptcy Counsel for the Debtor-In-Possession *Nunc Pro Tunc* to the Petition Date;

  ii.    Debtor's Emergency Motion For Agreed Motion for Order Authorizing the Debtor to Use Cash Collateral, Factor Accounts, and Provide Adequate Protection;

  iii.    Debtor's Emergency Motion for Entry of an Order: (I) Authorizing the Payment of Priority Pre-Petition Wages, Salaries, and Employee Benefits; and (II) Authorizing the Debtor to Continue the Maintenance of Employee Practices amd Benefit Plans and Programs in the Ordinary Course of Business;

  iv.    Debtor's Emergency Motion For the Entry of an Interim and Final Orders Authorizing the Debtor to Pay Critical Vendor Claims in the Ordinary Course of Business.

---

[2]    Any capitalized terms not otherwise herein defined are ascribed the same meaning as in each respective First Day Motion.

21.     I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical and necessary to the Debtor's ability to maximize the value of its assets for its creditors and shareholders.

22.     The Debtor will provide notice to all motions presented to the Court for consideration as First Day Motions on all parties identified on the master service list.

**A.      Debtor's Emergency Application for Approval, on An Interim and Final Basis, of Employment of Eyal Berger and the Law Firm of Akerman LLP as General Bankruptcy Counsel for the Debtor-In-Possession *Nunc Pro Tunc* to the Petition Date.**

23.     The Debtor seeks authority to retain, on an interim and final basis, Eyal Berger, Esq. ("Mr. Berger") and the law firm of Akerman LLP ("Akerman") as general bankruptcy counsel *nunc pro tunc* to the Petition Date.  The Debtor understands that Mr. Berger and Akerman have extensive experience representing Chapter 11 debtors in this district (and others across the country), and that they are well-qualified to serve as general bankruptcy counsel to the Debtor.  The Debtor believes it is in the Debtor's best interests, and those of its creditors, that Mr. Berger and Akerman be retained to serve as Debtor's general bankruptcy counsel in its Chapter 11 case.

24.     To the best of the Debtor's knowledge, except as disclosed in the Declaration of Eyal Berger, on behalf of Akerman LLP, as proposed counsel for the Debtor, neither Mr. Berger nor Akerman has any connection with the Debtor's creditors or other parties in interest or their respective attorneys.

25.     I am aware that corporations may not appear in a Florida or Federal court within Florida *pro se*, and that only a licensed attorney may appear on their behalf.  Because there is a myriad of relief that must be sought from the Court immediately, the Debtor will suffer immediate and irreparable harm if it is unable to obtain the services of counsel before a final

hearing on the Application for approval of counsel's employment can be convened. For example, the Debtor requires the Court's approval of an agreement for the use of cash collateral. Without the use of cash, the Debtor will be unable to operate its business and maximize the value of its assets for the benefit of its estate. It is, therefore, my belief that only with the granting of interim approval of counsel's employment will such immediate and irreparable injury be avoided. In that regard, counsel advises that this relief has been granted in other Chapter 11 cases in this District. Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtor, its estate and creditors to retain Akerman as its counsel.

**B.** **Debtor's Emergency Motion For Agreed Motion for Order Authorizing the Debtor to Use Cash Collateral, Factor Accounts, and Provide Adequate Protection.**

26.     The Debtor seeks authorization to consensually use the cash collateral of Lender pursuant to a 13 week cash collateral budget consensually negotiated with Lender prior to the commencement of this case.

27.     In connection with the Debtor's proposed use of Cash Collateral hereunder and in order to provide the Lender with adequate protection for the aggregate diminution of the Cash Collateral resulting from the Debtor's use thereof, the Debtor has agreed, subject to approval of this Court, that the Lender, shall have, *nunc pro tunc* as of the commencement of this Chapter 11 case, a replacement liens pursuant to section 361(2) of the bankruptcy code on and in all property of the Debtor acquired or generated after the Petition Date, but solely to the same extent and priority, and of the same kind and nature, as the property of the Debtor securing the prepetition obligations to the Lender under the Pre-Petition Loan Documents. In addition, the Debtor has consented to the payment of $17,500 in monthly adequate protection payments to the Lender that equate to the average contractual interest and other charges the Debtor was paying Lender under the Pre-Petition Loan Documents.

28.     In the event that diminution occurs in the value of Cash Collateral from and after the Petition Date as a result of the Debtor's use thereof in an amount in excess of the value of the replacement liens granted herein, the Debtor has also agreed to provide the Lender the right to assert an administrative claim under section 507(b) of the Bankruptcy Code with priority over all other administrative expense claims, subject to the Debtor's obligations to pay: (i) fees to the Office of the Untied States Trustee, (ii) the Clerk of Court; and (iii) allowed fees of Akerman, LLP not to exceed $65,000.

29.     The Debtor proposes to use the Cash Collateral strictly in accordance with the terms of that certain Budget prepared by the Debtor. The Budget covers the period from the Petition Date through July 12, 2019. The Debtor also requests that it be authorized: *(i)* to exceed any line item on the Budget by an amount equal to ten percent (10%) of each such line item; or *(ii)* to exceed any line item by more than ten percent (10%) so long as the total of all amounts in excess of all line items for the Budget do not exceed ten percent (10%) in the aggregate of the total Budget.

30.     Supplemental to the replacement liens provided to the Lender, the Debtor will furnish the Lender with such financial and other information as required by the Pre-Petition Loan Documents or other reports as the Lender reasonably requests.

31.     The Debtor needs the use of cash collateral immediately to continue operating and in order to, among other things, pay wages and other direct operating expenses, and generally conduct the Debtor's business affairs so as to avoid immediate and irreparable harm to the estate and the value of its assets.  Without access to this working capital, the Debtor will be forced to halt operations, causing irreparable harm to the Debtor's enterprise and its creditors.  The proposed use of cash collateral, therefore, is essential to sustain the Debtor during this Chapter

11 case and to prevent irreparable harm to the Debtor's estate. The Budget provides adequate funds to pay anticipated administrative expenses during the pendency of this Chapter 11 case.

32.      The proposed use of cash collateral is necessary, essential and appropriate for the continued operation of the Debtor's business, and the preservation of the assets of the estate. Given the circumstances of this case and of the Debtor, the terms of the use of cash collateral are fair, reasonable and adequate, and in the best interest of the Debtor's estate.  The use of cash collateral provides the Debtor with working capital pursuant to the Budget, pending approval of the use of cash collateral on a permanent basis at the Final Hearing.  The Debtor and I submit that granting of the relief sought is necessary and appropriate and in the best interests of the Debtor, its creditors, its shareholders and its customers.

**C.      Debtor's Emergency Motion for Entry of an Order: (I) Authorizing the Payment of Priority Pre-Petition Wages, Salaries, and Employee Benefits; and (II) Authorizing the Debtor to Continue the Maintenance of Employee Practices amd Benefit Plans <u>and Programs in the Ordinary Course of Business</u>.**

33.      The Debtor is requesting the entry of an order authorizing the Debtor to (a) pay various pre-petition wages, salaries, commissions and employee benefits of the Debtor's employees, and (b) continue the Debtor's various pre-petition Employee practices, benefit plans and programs provided by the Debtor in the ordinary course of its business.

34.      As of the Petition Date, the Debtor employed approximately thirty-four (34) full and part time employees, including management, service technicians, and administrative support staff. The Debtor, through CoAdvantage, a professional employer organization, pays its employees every other week with its next payroll set to be paid on Friday, April 26, 2019.  The payroll for the employees to be distributed on April 26, 2019 is for the pay period ending April 19, 2019, which will include six (6) days of pre-petition employee obligations, from April 8, 2019 through and including April 15, 2019.  The total amount of gross wages due to be paid to

48600445;2

CoAdavantage for the pre-petition payroll is approximately $40,323.58  The Debtor also pay its payroll taxes each payroll cycle through CoAdvantage and Debtor was current on the Petition Date.

35.      As part of the foregoing relief, the Debtor also seeks authorization to pay all federal and state withholding and payroll-related taxes relating to pre-petition periods including, but not limited to, all withholding taxes, Social Security taxes, and Medicare taxes, as well as all other withholdings such as life insurance and other employee deductions, if any. With additional withholding obligations, the total amount due to be paid to CoAdavantage for the pre-petition payroll is approximately $46,863.13.

36.      The Debtor has established various employee benefit plans and policies for the benefit of its employees which include medical, and life insurance, vacation pay, personal time off and other similar benefits (collectively, the "Employee Benefits").  The Debtor provides its health and life insurance directly to employees through deductions in payroll paid to Intuit on the Employees' behalf.

37.      All regular, full-time hourly Employees are eligible to accrue paid sick and personal days.  The Debtor seeks authority to honor in the ordinary course of business all liabilities to its Employees that arose under its vacation and personal day policies prior to the Petition Date.  The Debtor anticipates that its Employees may utilize any accrued vacation time or personal days in the ordinary course of business without resulting in any material cash flow requirements beyond the Debtor's normal payroll obligations.  Any accrued vacation lapses at the end of each calendar year.

38.      I believe that the relief requested in the Employee Motion will enable the Debtor to maintain its current operations without interruption, thereby preserving the value of the business, and, at the same time, maintain employee morale.  Without the relief requested, the

Debtor's ability to represent and protect its clients, preserve the Debtor's going concern value and maximize the value of its assets for all creditors of its estate will be adversely affected if the Debtor is unable to retain its dedicated and loyal Employees.

**E.     Debtor's Emergency Motion for Authority to Pay Pre-Petition Obligations to the Debtor's Critical Vendors.**

39.     In connection with the operation of the Debtor's business, the Debtor uses Parts Town LLC ("Parts Town") and Giles Food Service Equipment ("Giles" and collectively, with Parts Town, the "Critical Vendors").

40.     Parts Town provides the following parts to the Debtor that are distributes OEM restaurant and foodservice parts for commercial kitchens in the United States. Parts Town offers replacement parts and accessories related to commercial beverage equipment, broilers, fryers, griddles, holding units, ice machines, pasta cookers, ranges, refrigeration equipment, steamers, toasters, and warmers. The Debtor purchases approximately 70% of its inventory from Parts Town at competative and already established rates.

41.     Giles produces a wide variety of commercial equipment, including fryers, ventilation hoods, merchandisers, and prep tables.  The Debtor's largest customer, Publix Supermarket, utilizes Giles' equipment in its stores.  The Debtor purchases inventory from Giles at a preferred rate in order to service Publix's equipment as required.

42.     The Debtor currently owes $18,447.25 in prepetition debt to Giles and $76,405 in prepetition debt to Parts Town. The Debtor seeks authorization to pay $12,500 per week to the Critical Vendors (the "Critical Vendor Payment").  The Critical Vendor Payment shall be shared on a pro rata basis by and between the Critical Vendors, until such time as both the Parts Town Critical Vendor Claim and the Giles Critical Vendor Claim have been paid in full.

43.     The Critical Vendors have both informed me that they will not supply the Debtor with continued inventory in the event the Debtor does not repay the pre-petition obligations.

44.     Both Critical Vendors supply the parts necessary for the Debtor to use in servicing its customer contracts and there is no comparable replacement in the marketplace.

45.     Any interruption of shipments from the Critical Vendors, even if briefly, would disrupt the Debtor's ability to continue with its business operations and service its customers, including one of its most important customers, Publix, thereby negatively impacting customer relationships, revenues and profits.  Therefore, it is critical that Critical Vendors continue to supply the Debtor uninterrupted during this Chapter 11 case.

## V.     DEBTOR'S OBJECTIVES IN THIS CASE

46.     The primary purposes of the filing of this Chapter 11 Case is to, among other things:  (a) continue the Debtor's operations while in Chapter 11 with as little disruption as possible; (b) allow the Debtor to continue serving its valued customers and operate its business pending a restructuring of its debt, and (c) establish procedures for the smooth and efficient administration of this case.  Through the motions described above and other motions and applications the Debtor may file later, the Debtor hopes to minimize any adverse effects that this Chapter 11 case might otherwise have on its business and its customers.  For all of these reasons, I respectfully request that this Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

48600445;2

I respectfully request that this Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

### 28 U.S.C. § 1746 Declaration

I declare under penalty of perjury that the foregoing is true and correct.  Executed on April _16_ 2019.

Paul Podhurst
President and CEO